UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COBURN GROUP, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 2448 |
| | ) | |
| v. | ) | District Judge Charles R. Norgle |
| | ) | Magistrate Judge Geraldine Soat Brown |
| WHITECAP ADVISORS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Geraldine Soat Brown, United States Magistrate Judge

Before the court is Defendant Whitecap Advisor LLC's Motion to Compel Return of Documents and to Strike Deposition Testimony. [Dkt 96.] For the reasons set out below, to the extent that it was not resolved at previous hearings, the motion is granted.

**BACKGROUND**

Coburn Group, LLC, ("Coburn") claims in this lawsuit that Whitecap Advisors, LLC, ("Whitecap") breached an oral contract to pay Coburn fees for referring investors to Whitecap. (Second Am. Compl.) [Dkt 81.] In the present motion, Whitecap originally requested an order requiring Coburn to return two documents totaling 16 pages that it claims are privileged and were inadvertently produced in its document production of approximately 40,000 pages. (Mot. at 1.) Whitecap also asked that the court strike any deposition testimony related to the documents and bar Coburn from using any information obtained from the documents. (*Id.*) Coburn refused Whitecap's

1

request to return the documents and opposes the motion. (*See* Pl.'s Resp.) [Dkt 107.] The parties submitted a number of briefs.[1] Several hearings were held, at which almost all of the issues were resolved. (*See* dkt 153, 154, 159.) The sole remaining issue is a half-page long e-mail that Whitecap employee Brian Broesder sent to Whitecap principal Eric Kamisher on September 26, 2007 (hereinafter, "the e-mail").[2]

Whitecap claims that the e-mail is protected work product and was produced inadvertently despite the efforts of Whitecap and its counsel. Michael Hultquist, one of Whitecap's attorneys, states that, in order to respond to Coburn's discovery requests, Whitecap provided him with computer hard drives containing approximately 72,000 pages of potentially responsive documents. (Hultquist Suppl. Aff. ¶ 6.) He assigned two experienced paralegals to review the documents and to separate them into categories for production or assertion of privilege, including attorney-client and work-product material. (*Id.*) That review took five weeks. (*Id.* ¶ 9.) On March 6, 2008, Whitecap produced approximately 40,000 responsive documents to Coburn in hard-copy form. (*Id.* ¶ 10.) A CD with electronic copies of those documents was sent to Coburn in June 2008. (*Id.*)

---

[1] Whitecap filed a memorandum in support of its motion ("Mem." [dkt 97]), attaching the affidavit of its attorney, Michael Hultquist ("Hultquist Aff."), with exhibits. Coburn filed a response brief, ("Resp."), and Whitecap filed a reply brief ("Reply" [dkts 116, 117]). After receiving an order requesting additional briefing regarding Fed. R. Evid. 502, the parties each filed briefs ("Coburn's 502 Br." [dkt 128] and "Whitecap's 502 Br." [dkt 129]). Whitecap supplemented the record with additional deposition testimony ("Mot. to Suppl." [dkt 136] and exhibits [dkt 138]) and, later, an affidavit from Eric Kamisher ("Kamisher Aff." [dkt 158]). Whitecap also filed a Supplemental Affidavit of Michael D. Hultquist ("Hultquist Suppl. Aff." [dkt 182], and Coburn filed a Response to Michael D. Hultquist's Supplemental Affidavit ("Resp. to Suppl. Aff." [dkt 190]). The documents were filed under seal pursuant to leave granted by the District Judge. [Dkt 95.]

[2] Mr. Hultquist's affidavit attached the e-mail at issue here as Ex. 1 (bates numbered WHITECAP39877). The e-mail lists a number of attachments that are not part of the exhibit and are not at issue in the motion.

Mr. Hultquist states that he first realized that the e-mail had been produced to Coburn when Coburn's counsel began questioning Mr. Broesder about it at his deposition on July 14, 2008. (Hultquist Suppl. Aff. ¶ 14; *see also* Mem., Ex. 3, Dep. of Brian Broesder at 222-223.) Mr. Hultquist objected. (Broesder Dep. at 223.) The next day, at Mr. Kamisher's deposition, Mr. Hultquist told Coburn's counsel that the e-mail was privileged and work-product protected, and requested its return. (Hultquist Suppl. Aff. ¶ 15; Mem., Ex. 4, Dep. of Eric Kamisher at 24-25.) Two days after Mr. Kamisher's deposition, Mr. Hultquist again requested the return of the e-mail. (Hultquist Suppl. Aff. ¶ 16; Mem., Ex. 5.) Whitecap agreed that Coburn could have some time to research the issues about the e-mail and the other then-disputed document based on Coburn's attorneys' representation that they would "quarantine" the documents and not use or disseminate them while doing the research. (Mem., Exs. 5 and 6.) Notably, Coburn's counsel agreed that it would not raise any delay by Whitecap in bringing a motion about the documents as evidence that Whitecap did not consider the documents protected. (Mem., Ex. 6.) On August 5, 2008, Coburn's counsel wrote to Whitecap's counsel refusing to return the documents. (Mem., Ex. 7.) In that letter, Coburn's counsel asked whether Whitecap intended to present the issue to the court, agreed to keep the documents secured until the court's decision, and requested that the parties try to work out an agreed briefing schedule in light of the lawyers' schedules. (*Id*.) Whitecap filed its motion on September 5, 2008.

It was unclear initially whether Whitecap is asserting both attorney-client privilege and work-product protection for the e-mail. In its Reply, Whitecap clarified that it is asserting only work-product protection, not attorney-client privilege. (Reply at 3.) In opposition to Whitecap's motion, Coburn argues: first, that the e-mail is not protected work product; second, that Whitecap's

3

inadvertent production waived any protection; third, that Coburn is entitled to the e-mail because it reveals that Whitecap mislead the court on an earlier motion; and, relatedly, that "Illinois' ethics rules not only allow Coburn Group's attorneys to use these documents in this litigation but arguably demand that they do." (Resp. at 2-3, 8.)

**ANALYSIS**

**I.     Work-product protection**

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." Fed. R. Civ. P. 26 (b)(3)(A). Subject to the rule relating to expert witnesses, work-product materials may only be discovered if they are otherwise discoverable under Rule 26(b)(1) and if the requesting party shows "substantial need" for them and an inability to get the "substantial equivalent" of the materials without "undue hardship." *Id.* Even if discovery is ordered, the court must protect what is referred to as "opinion" work product, that is, "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). The primary test of work product is "whether the material sought to be protected from discovery was prepared in anticipation of litigation." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.* 145 F.R.D. 84, 86 (N.D. Ill. 1992).

The court's *in camera* review shows that the e-mail is work product. The e-mail was sent on September 26, 2007, more than four months after this lawsuit was filed. The subject line of the e-mail is "Requests on Coburn Filing." In it, Mr. Broesder provides Mr. Kamisher with information he gathered about Whitecap's dealings with Coburn, in order to respond to requests by attorneys who

were already representing Whitecap. (Hultquist Suppl. Aff. ¶ 12.)

Coburn argues that the e-mail is not work product because it contains only "underlying facts regarding the residences of certain Whitecap investors." (Resp. at 7.) That is not completely accurate. The e-mail is not opinion work product – there is no disclosure of an attorney's mental impressions, conclusions, opinions or theories – but it is still work product. The e-mail communicates Mr. Broesder's responses to questions posed by Mr. Kamisher for the attorneys regarding the "Coburn Filing." In order to formulate those responses, Mr. Broesder collected, selected and organized certain information. The facts regarding the residences of Whitecap investors are not protected from discovery, but the work done by Mr. Broesder in preparing the responses is protected. "Work-product protection does not shield information from disclosure; it only protects a party against having to turn over particular documents containing the information." Edna Selen Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* vol. 2, 821 (5th ed., ABA 2007).

Thus, the e-mail is protected against disclosure unless Whitecap has waived the protection or Coburn has made the showing of "substantial need" required by Rule 26(b)(3)(A)(ii).

**II.     Waiver**

Fed. R. Evid. 502, which became effective September 19, 2008, creates a new framework for managing disclosure issues in a cost effective manner in the age of large electronic document productions. Rule 502 comm. explanatory n. (2007).[3] Before Rule 502 was adopted, courts

---

[3] Rule 502 applies "insofar as is just and practicable" to all proceedings pending on September 19, 2008. Pub. L. No. 110-322, § 1(c), 122 Stat. 3537, 3538 (2008). There is no reason why Rule 502 should not apply to this motion.

considering whether the unintended disclosure of a privileged document resulted in a waiver of privilege looked at the circumstances surrounding the disclosure and followed a "balancing approach" considering a number of factors. *See e.g. Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 388-389 (7th Cir. 2008). Rule 502 organizes those considerations into three steps:

> When made in a Federal proceeding or to a Federal office or agency, the disclosure [of a communication or information covered by the attorney-client privilege or work-product protection] does not operate as a waiver in a Federal or State proceeding if:
>
> (1) the disclosure is inadvertent;
>
> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>
> (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Rule 502(b).

A. <u>Inadvertent disclosure</u>

Rule 502 does not define "inadvertent." Under the prior case law, reaching the conclusion that a document had been "inadvertently produced" required analysis of the circumstances surrounding the production, including the number of documents produced in discovery and the care with which the pre-production document review was performed. *See Judson Atkinson*, 529 F.3d at 388. If the production was found to be inadvertent, the court used a "balancing approach" to determine whether the inadvertent disclosure waived the privilege. In that step, many of the same factors, such as scope of discovery and reasonableness of precautions taken, were reviewed again. *See id.*

6

Some opinions determining the question of "inadvertent disclosure" under subpart (b)(1) of Rule 502 repeat the prior case law's process. *See e.g. Heriot v. Byrne*, ___ F.R.D. ___, 2009 WL 742769 at *11 (N.D. Ill. March 20, 2009). In *Heriot*, for example, to determine whether the disclosure was inadvertent, the court considered "factors such as the total number of documents reviewed, the procedures used to review the documents before they were produced, and the actions of producing party after discovering that the documents had been produced." *Id.* (quotations and citations omitted). The court also applied the first two of these factors to the analysis under subpart (b)(2), considering whether the producing party took reasonable steps to prevent disclosure. *Id.* at *13.

In this court's view, the structure of Rule 502 suggests that the analysis under subpart (b)(1) is intended to be much simpler, essentially asking whether the party intended a privileged or work-product protected document to be produced or whether the production was a mistake.[4] To start, the parallel structure of subparts (a)(1) and (b)(1) of Rule 502 contrasts a waiver that is *intentional* with a disclosure that is *inadvertent*.[5] More importantly, subparts (b)(2) and (b)(3) separately address the

---

[4] In transmitting proposed Rule 502 to Congress, the Chair of the Judicial Conference Committee on Rules of Practice and Procedure stated that the Judicial Conference had been urged to devise a rule to "protect against the forfeiture of privilege when a disclosure in discovery is the result of an innocent mistake." Ltr. from Lee H. Rosenthal, Chair, Comm. on Rules of Practice and Procedure, to Hon. Patrick J. Leahy, Chairman, Comm. on the Judiciary, U.S. Senate, and Hon. Arlen Specter, Member, Comm. on the Judiciary, U.S. Senate, at 2 (Sept. 26, 2007), *Federal Civil Judicial Procedure and Rules* 431 (West 2009).

[5] Rule 502(a) provides that a disclosure that waives the attorney-client privilege or work-product protection extends the waiver to undisclosed communications only if:
  (1) the waiver is intentional;
  (2) the disclosed and undisclosed communications or information concern the same subject matter; and
  (3) they ought in fairness to be considered together.

7

reasonableness of the privilege holder's steps to prevent disclosure and to rectify the error. That they are set out as separate subparts distinct from the question of inadvertent disclosure strongly suggests that the drafters did not intend the court to consider for subpart (b)(1) facts such as the number of documents produced only to repeat the consideration of those same facts for subparts (b)(2) and (b)(3).

Here, there is no real dispute that Whitecap did not intend to produce a work-product protected e-mail, and that producing the e-mail was a mistake. The court finds that the production of the e-mail was inadvertent.

B.  Reasonable steps to prevent disclosure

The factors used in prior case law are helpful in determining what are "reasonable steps to avoid disclosure" under subpart (b)(2) of Rule 502. According to the Judicial Conference Rules Committee, the rule "is really a set of non-determinative guidelines that vary from case to case. . . . [C]onsiderations bearing on the reasonableness of a producing party's efforts include the number of documents to be reviewed and the time constraints for production." Rule 502 comm. explanatory n. (2007).

The scope of discovery is a logical starting point in many cases because "[w]here discovery is extensive, mistakes are inevitable and claims of inadvertence are properly honored so long as appropriate precautions are taken." *Judson Atkinson,* 529 F.3d at 388 (quotations and citations omitted). As discussed above, Whitecap gave its attorneys computer hard drives containing approximately 72,000 pages of potentially responsive documents, from which 40,000 pages of documents were produced to Coburn. Those numbers substantially exceed the number of documents

that have been characterized as "large." *See Heriot*, 2009 WL 742769 at *12 (collecting cases where production characterized as "large" ranged from 7864 to 25,000 documents).

Mr. Hultquist, one of Whitecap's lead counsel for this case, supervised the document production and submitted an affidavit about the document review process. He states that he implemented a protocol for two experienced paralegals with 17 and 16 years' experience, respectively, to follow in reviewing the documents received from Whitecap for production to Coburn. (Hultquist Suppl. Aff. ¶¶ 6-9.) The protocol to govern the document review included the following parameters:

    (a)    identify responsive documents by date;

    (b)    identify and mark for my review any correspondence between Whitecap's general counsel and any employee at Whitecap;

    (c)    identify and mark as privileged any correspondence between Whitecap's employees and Whitecap's outside counsel;

    (d)    identify and mark as privileged documents prepared by any employee of Whitecap in anticipation of or in preparation for litigation pursuant to request by Whitecap's outside counsel;

    (e)    pursuant to a protective order entered on November 16, 2007, mark responsive documents relating to customers as "confidential material" or "attorneys only;" and

    (f)    segregate non-responsive documents, including documents relating to "Offshore II."

(*Id*. ¶ 7.) The review took five weeks, during which Mr. Hultquist reviewed many documents that were marked as privileged, and other documents that the paralegals presented to him with questions. (*Id*. ¶ 9.)

Coburn criticizes Whitecap's use of paralegals for the document review. (Resp. at 10.)

9

Although the experience and training of the persons who conducted the review is certainly relevant to the reasonableness of the review, this court joins with *Heriot* in declining to hold that the use of paralegals or non-lawyers for document review is unreasonable in every case. *Heriot*, 2009 WL 742769 at *12 n.10. In light of the large number of documents to be reviewed, Whitecap's use of experienced paralegals who were given specific direction and supervision by a lawyer who is lead counsel in the case was not unreasonable.

Coburn also claims that the protocol described by Mr. Hultquist did not teach the paralegals what to look for in determining whether a document was "prepared in anticipation of litigation." (Resp. to Suppl. Aff. at 2.) Coburn argues that it is unreasonable to expect the paralegals to identify the e-mail at issue here as work product because it is not apparent on its face that it is work product and therefore the procedure was unreasonable. (*Id*.)

Unquestionably, reviewing documents for work product can be challenging because sometimes there are subtleties to the determination. As Coburn points out, whether a document is work product can rest on facts not apparent from the face of the document, as in this case. Here, although there are clues on the face of the e-mail, the fact that it was prepared to provide information to Whitecap's attorneys is not apparent from the document itself. But the document review can not be deemed unreasonable solely because a document slipped through which in close examination and with additional information turns out to be privileged or work product. If that were the standard, Rule 502(b) would have no purpose; the starting point of the Rule 502(b) analysis is that a privileged or protected document was, in fact, turned over.

Notably, as far as has been presented to this court, only three documents that Whitecap claimed as privileged or protected slipped through the review of 72,000 pages and production of

40,000 pages, and all three of those were e-mails.[6] *Cf. Heriot*, 2009 WL 742769 at *12 (196 privileged documents were inadvertently produced out of a total production of 1499 documents).

Coburn cites *Relion, Inc. v. Hydra Fuel Cell Corp.*, 2008 WL 5122828 at *3 (D. Or. Dec. 4, 2008), in which the court found that the producing party waived attorney-client privilege for two e-mails. The e-mails were part of 40 feet of documents that were produced to the requesting party after review by the producing party's attorneys and support staff. *Id*. The requesting party selected and copied certain documents for its own use, and made both paper and electronic copies of those selected documents for the producing party. *Id*. The court held that because the producing party had not reviewed either of those two sets of the selected and copied documents, it had failed to take "all reasonable means" to preserve the confidentiality of the documents. *Id*.

This court respectfully disagrees with the *Relion* decision. The standard of Rule 502(b)(2) is not "all reasonable means," it is "reasonable steps to prevent disclosure." Furthermore, the decision appears to be contrary to the view of the Judicial Conference Rules Committee that Rule 502 "does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake." Rule 502 comm. explanatory n. (2007); *see also Heriot*, 2009 WL 742769 at *13(citing committee note and stating that the producing party "had no duty to re-review the documents after providing them to the Vendor").

The court finds that Whitecap took reasonable steps to prevent disclosure. That Whitecap made a mistake in producing the e-mail despite those steps is not fatal to its claim for protection.

---

[6]Whitecap also inadvertently produced another e-mail that Coburn's counsel recognized as privileged and promptly (and commendably) returned to Whitecap. (Resp., Ex. 6, Aff. of Michael Lieber.)

11

C.     Reasonable steps to rectify the error

Coburn cites two time periods as demonstrating that Whitecap failed to promptly take reasonable steps to rectify the error: the four month delay between the document production in March 2008 and Whitecap's counsel's discovery at the depositions in July 2008 that the e-mails had been produced, and the five weeks between Coburn's final refusal to return the documents on August 5, 2008 and Whitecap's filing the present motion. (Resp. at 11-12.)

Prior to Rule 502, courts in this circuit looked to the time between a party's learning of the disclosure and that party's taking action to remedy it, rather than the time that elapsed since the document was placed in the hands of the other party. *See e.g. Judson Atkinson*, 529 F.3d at 389 (looking to the time between the filing of the disputed document as an exhibit and the producing party's request for return); *U.S. v. Natl. Assn. of Realtors*, 242 F.R.D. 491, 495 (N.D. Ill. 2007) (no waiver where several years elapsed between production and party's knowledge of the disclosure but the party took "virtually no time" to rectify the error). The Committee's comment that Rule 502 does not require a post-production review supports this view that the relevant time under subpart (b)(3) is how long it took the producing party to act after it learned that the privileged or protected document had been produced.

In this case, there is no dispute that Whitecap was unaware that the e-mail had been produced until Coburn's counsel asked Mr. Broesder about it, and that Whitecap's counsel immediately objected to its use. The next day Whitecap's counsel requested its return and followed that up with a written request. There was no delay on Whitecap's part in trying to rectify the error once it was discovered.

As for the delay in filing the motion, the facts recited above show that counsel for both sides

acted reasonably and civilly in dealing with the disputed documents and the associated deposition transcripts. The lawyers for both sides needed time to investigate the facts and law surrounding the documents, and the issues turned out to have some complexity. In light of the fact that Whitecap accommodated Coburn's counsel's request for additional time to formulate Coburn's position, and that Coburn agreed to "quarantine" the documents until the dispute was resolved, the time Whitecap took to file the actual motion was not unreasonable.

The court finds, pursuant to Rule 502, that Whitecap did not waive work-product protection for the e-mail.

### III.    Substantial need

The finding that the e-mail is protected work product and that Whitecap has not waived that protection does not end the inquiry. Coburn may still retain the e-mail if it demonstrates that it has "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

Coburn argues that it should be able to retain the e-mail because, in its view, paragraph 4 in the e-mail (relating to Whitecap's Illinois investors and whether any were brought to Whitecap by Coburn) contradicts statements Whitecap made in 2007 when it moved to dismiss Coburn's complaint for lack of personal jurisdiction. Importantly, Coburn does not argue that it has not be able to get discovery about Whitecap's Illinois investors. Rather, it is the e-mail itself that Coburn wants, to seek sanctions and "show at trial a pattern of untruthfulness by Kamisher . . . ." (Resp. at 2.)

As requested by Coburn, the court has carefully compared Mr. Broesder's statement in paragraph 4 of the e-mail to the statements Whitecap made when moving to dismiss and in Mr.

13

Kamisher's various declarations in support of Whitecap's motion. In a footnote in its memorandum on the motion to dismiss Whitecap stated, "Of the approximately 80 investors in Whitecap's funds, Plaintiff introduced only about 18 of them (none of which were from Illinois)." (Mem. Supp. Def's Mot. Dismiss at 10 n. 9.) [Dkt 21.] Mr. Kamisher's supporting declaration stated, also in a footnote, "Although one such investment was made by an investor who apparently had an Illinois agent, that investor – like all of the others Coburn introduced to us who made any investment with us – was *not* from Illinois." (Decl. Eric S. Kamisher ¶ 16 n. 10.) [Dkt 19.] After Coburn filed an amended complaint, Whitecap filed a second motion to dismiss in which it repeated the statement quoted above. (Mem. Supp. Def's Mot. Dismiss Am. Compl. at 14 n. 9.) [Dkt 31.] Mr. Kamisher filed a second declaration, dated August 29, 2007, in which he repeated the comment about the investor with an Illinois agent, in order to dispute Coburn's assertion that an Illinois company invested in Whitecap. (Decl. Eric S. Kamisher ¶ 24 n.16.) [Dkt 32.] Mr. Broesder sent the e-mail, including paragraph 4, to Mr. Kamisher on September 26, 2007. Two days later, Whitecap filed a reply memorandum with a third declaration from Mr. Kamisher in which he said, "Less than 10% of Whitecap's funds under management come from Illinois, and none of those Illinois-based investments originated with Coburn." (Decl. Eric S. Kamisher ¶ 32.) [Dkt 36-3.] Coburn sought to file a sur-reply including a declaration from its principal, Andrew Coburn, responding to Mr. Kamisher's declaration. (Plf.'s Mot. File Sur-Reply Decl.) [Dkt 38.] Mr. Coburn stated, *inter alia*, that he took Mr. Kamisher's statement to mean that "almost 10% of Whitecap's assets under management come from Illinois." (Decl. Andrew C. Coburn ¶ 48.) [Dkt 38-2.] Coburn's motion to file the sur-reply was denied, however, because by then the District Judge had denied Whitecap's motion to dismiss. (Opinion and Order, Oct. 3, 2007.) [Dkt 43.] The District Judge found that "Whitecap has clearly transacted

14

business within the State of Illinois, as it has entered into the Services Agreement with Coburn, an Illinois citizen, traveled to Illinois to discuss business relationships with Coburn, and sought out potential Illinois-based investors." (*Id.* at 7.) The opinion did not discuss, let alone rest on, whether more or less than 10% of Whitecap's assets under management are from Illinois.

The court cannot ascribe to the e-mail the significance Coburn assigns it. Mr. Broesder prefaced paragraph 4 with the disclaimer that his information reflects "a quick glance" and that it is "approximate." Whitecap's statements to the court are not dramatically at odds with Mr. Broesder's approximation, and Mr. Kamisher may well have had other information in addition to Mr. Broesder's e-mail. Importantly, the District Judge had no trouble denying Whitecap's motion based on evidence other than the details of the disputed statements. Coburn does not claim that it has not been able to obtain discovery into the facts about Whitecap's Illinois investors. Accordingly, the court concludes that Coburn has not made the showing required by Rule 26(b)(3)(A)(ii).

Finally, relying on a 1999 advisory opinion by the Illinois State Bar Association, Coburn's attorneys argue that they have a right, indeed, perhaps a duty, to retain the e-mail in order to represent their client zealously. (Resp. at 14, Ex. 7, ISBA Advisory Op. on Prof. Conduct 98-04 (Jan. 1999).) The advisory opinion concluded that a lawyer who, without notice of the inadvertent transmission, receives and reviews an opposing party's confidential materials through the error or inadvertence of opposing counsel, may use the information in such materials. (*Id*. at 1.)

The advisory opinion did not purport to address a situation where, as here, the court has found that the document retains work-product protection. Rule 502 prevents inadvertent disclosure from waiving the assertion of privilege or protection if the privilege holder has acted reasonably. That rule applies in federal court even if state law provides the rule of decision. Rule 502(f). Additionally, the

15

advisory opinion did not have the force of law even when it was issued and the continuing validity of its conclusion is doubtful in light of the evolution of the law in the past decade. The recently revised Illinois Rules of Professional Conduct added a new subsection requiring a lawyer who receives a document that the lawyer knows was inadvertently sent to notify the sender promptly. Ill. Rule of Prof. Conduct 4.4(b) (effective Jan. 1, 2010). The commentary states that the purpose of the notification is to allow the sender to take protective measures, although whether the privileged status of the document has been waived is beyond the scope of the rule. (*Id*. comment ¶ 2.) Requiring the receiving lawyer to notify the sending lawyer is clearly at odds with any purported duty on the part of the receiving lawyer to use the information for the benefit of his or her client.

Under Rule 502, Whitecap may assert work-product protection for the e-mail notwithstanding the inadvertent disclosure. Coburn's counsel is not under a duty to use the e-mail and, indeed, is not permitted to use the e-mail.

## CONCLUSION

For the foregoing reasons, to the extent that it was not previously resolved, Defendant Whitecap Advisor LLC's Motion to Compel Return of Documents and to Strike Deposition Testimony is granted. Plaintiff Coburn Group, LLC and its counsel shall return the e-mail (document bates stamped WHITECAP 0039877), including any copies in any format, to Whitecap's counsel immediately and shall not use that document for any purpose.

**IT IS SO ORDERED.**

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

Dated: August 7, 2009